# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

———————————————————————

MATTHEW A. GRENIER<br>
      Plaintiff,

v.

TOWN OF SHREWSBURY,<br>
JOHN L. LEBEAUX, MOIRA MILLER,<br>
BRUCE R. CARD,<br>
MAURICE M. DEPALO, and<br>
JAMES A. MCCAFFREY,<br>
      Defendants.

———————————————————————

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

**CIVIL ACTION<br>NO. 12-40093-TSH**

</td></tr>
</table>

## MEMORANDUM OF DECISION AND ORDER
### September 26, 2014

**HILLMAN, D.J.**

### Background

Matthew A . Grenier ("Grenier") has filed claims against the Town of Shrewsbury ("Town"), John L. LeBeaux ("LeBeaux"), Moira Miller ("Miller"), Bruce R. Card ("Card"), and Maruice M. DePalo ("DePalo" and, together with Lebeaux, Miller, and Card "Board Members")[1] under Section 1983 for violation of his due process rights (Count I), and violation of the interstate commerce clause (Count II).    Grenier's claims arise out of the denial by the Town's Board of Selectmen ("Board") of his application for a Class 2 used car dealer license.   Grenier is suing the

---

[1] Plaintiff originally named James A. McCaffrey as a Defendant in this case. On June l0, 2013, the parties filed a stipulation of dismissal as to McCaffrey. *See Stipulation Of Dismissal As To James A. McCaffrey Only* (Docket No. 21).   While the Court has defined the term "Board Members" to include the remaining individual Defendants, it is understood that McCaffrey was a member of the Board at the time of the events relevant to this action.

Board Members in their individual and official capacities.   His Complaint seeks injunctive relief and monetary damages.

This Memorandum and Order of Decision addresses:

(1) Plaintiff's Motion for Partial Summary Judgment For Count 1: Violations Of Due Process Rights Under 42 U.S.C. §1983 Pursuant to Fed.R.Civ.P. 56 (Docket No. 41);

(2) Defendants' Motion For Summary Judgment (Docket No. 43); and

(3) Plaintiff's Motion To Strike (Docket No. 51).

For the reason set forth below, the motion to strike is *denied.*   Plaintiff's motion for partial summary judgment is *denied* and Defendants' motion for summary judgment is *granted*.

## Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp*., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case.'"   *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153.   The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152.   "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party

2

must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted). "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

### <u>Plaintiff's Motion To Strike</u>

Plaintiff seeks to strike portions of Defendants' material statement of facts. More specifically, Plaintiff seeks to strike paragraphs 29-31 of the *Concise Statement Of Undisputed Material Facts In Sup. Of Defs' Mot. For Sum. J.* (Docket No. 45)("*Defs.' Facts*") which refer to the decision of the Massachusetts Superior Court. He argues that because the lower court's holding was overturned by the Massachusetts Appeals Court ("MAC"), the lower court's rationale and basis of decision are irrelevant. Plaintiff also seeks to strike *Ex. M* to *Defs.' Facts, i.e.,* a copy of the Massachusetts Superior Court decision, on the same grounds. Defendants argue that the factual assertions and the copy of the lower court's decisions are relevant to Grenier's due process claims because it shows that post-deprivation remedies were available to him and that he availed himself of those remedies. The motion to strike paragraphs 29-31 of *Defs.' Facts* and *Ex. M* is denied.

3

Plaintiff also seeks to strike *Ex. B.* to *Defs.' Facts*, *i.e.,* the Town's answer to interrogatories on the grounds that they are irrelevant, immaterial, hearsay and conclusory." *Pl's Mot to Strike* (Docket No. 57), at p. 1   Plaintiff does not cite to any specific interrogatory answers that he finds objectionable, cites no legal authority in support of his request and makes no further argument as to why the exhibit is objectionable. The motion to strike *Ex. B* is denied.[2]

## **Facts**[3]

### *Grenier's Application For A Class 2 Used Car License*

On April 12, 1999, the Board adopted Policy Number 9 entitled "Limit the number of Class 2 used car licenses to a total of twenty (20)" ("Policy 9").   At all times relevant to this action, the following "Policy Statement Board of Selectman" was located on the Board's website:

….

1.    The Board of Selectmen on April 12, 1999 voted in favor of limiting the number of Class 2 used car dealer licenses to twenty (20). The Board of Selectmen conducted a public hearing on April 5, 1999. In addition, the board received public comments by telephone and surveyed surrounding Towns. It was then determined that limiting the number of Class 2 used car dealer licenses to twenty (20) would sufficiently meet the needs of the public for the Town of Shrewsbury.

2.    The Board of Selectmen will not take away current class two license holders licenses for this reason. However, as businesses move away, new licenses will not be issued to replace these.

3.    The Board of Selectmen will still be required to accept Class 2 used car dealer license applications and hold

---

[2]   I have denied the motion to strike and made findings of fact which include ¶¶29-31 and references to one or both of *Exs. M & B*.   However, I have not found it necessary to rely on them in deciding the issues raised by the cross-motions for summary judgment.

[3]   Plaintiff has not filed a concise statement of the material facts of record as to which he contends there exists a genuine issue to be tried. *See* LR, D.Mass., 56.1.   For that reason, I have adopted Defendants' Concise Statement Of Undisputed Material Facts In Support Of Defendants' Motion For Summary Judgment (Docket No. 45).

> hearings but could at any time deny a request based on the public's interest already being met.

4. The policy is set by the current Board and can be subject to review and change as condition in the Town of Shrewsbury change.

Policy 9 was revised on January 8, 2001 to modify paragraph 2 as follows:

2. The Board of Selectmen will not take away current Class 2 license holders licenses for this reason. A license will be reduced when a license is surrendered and no new license application is filed for the existing location within twelve (12) months of such surrendering. The intent is to allow a property owner up to twelve (12) months to continue the Class 2 operation on the existing parcel. Once the lapse exceeds twelve (12) months then the total number of Class licenses in the Town is reduced by one (1).

On March 10, 2003, the Board voted to grant a Class 2 license to Enterprise Rent-A-Car ("Enterprise"). There were already 20 Class 2 used car dealerships in the Town. Therefore, by approving the issuance of a Class 2 license to Enterprise, the Board exceeded the 20 Class 2 license limitation imposed by Policy 9. The Board determined that Enterprise's application was distinguishable from a standard application for a Class 2 license because Enterprise Rent-A-Car planned to rent brand new vehicles on site and then eventually sell those vehicles as used when it was time to replace them with new vehicles for rent. The Board concluded that a Class 2 license was ancillary to Enterprise's business function, which was primarily to rent vehicles. The Board set a condition that Enterprise could have a maximum of 100 vehicles on the lot with no more than 50 for sale. The Board's motion to approve the Class 2 license for Enterprise was subject to the terms and conditions of the Zoning Board of Appeals ("ZBA") and Planning Board.

Joseph Grenier ("Property Owner") is Grenier's father and the owner of real property together with the building thereon located at 787 Hartford Turnpike, Shrewsbury,

5

Massachusetts ("Site"). For zoning purposes, the Site is located in a Limited Industrial District ("LID") . On September 18, 2007, the Property Owner gave Grenier permission to conduct a business known as MAG Auto Sales at the Site. Grenier Construction Company, which is owned by the Property Owner, is also located at the Site. Grenier was planning to utilize 1,500 square feet of warehouse storage area for vehicles, as well as office space within a building that also housed Grenier Construction Company, for MAG Auto Sales.

In 2007, Grenier Construction Company d/b/a MAG Auto Sales applied for a Class 2 license to operate a used car dealership at the Site. When Grenier picked up the application from the Board office, he was told of the existence of Policy 9 by the secretary and was told that the Board was not issuing any additional licenses at that time. Before the first public hearing on Grenier's application, he also received a phone call from Board Chairman, Depalo, in which Chairman Depalo informed him that the Board had adopted a policy, which limited the number of Class 2 licenses and that the limit had already been met. Chairman Depalo also told Grenier that it was his right to still come in and present his case to the Board.

On October 15, 2007, before the start of the first hearing before the Board, Chairman Depalo informed Grenier that the Board had received a letter from the building inspector with respect to Grenier's application advising that the Site was located in the LID which did not permit the display and sale of motor vehicles. Consequently, Grenier was told that he would need a variance from the ZBA to allow the sale of motor vehicles on the Site. During the hearing, Grenier stated that his business would primarily involve Internet sales, but he would also have two or three vehicles at the Site. At the conclusion of the hearing, Grenier withdrew his application without prejudice in order to obtain a variance from the ZBA prior to applying for a Class 2 license.

On December 3, 2007, in light of Grenier's application, the Board held a meeting to review

Policy 9.   During the meeting, the following comments were made:

> MR. CHAIRMAN [DEPALO]: His sales were going to be primarily, in this case, primarily on the Internet. But if you're going to sell cars, Class II used cars in town, you need – or anywhere in the state – you need to have a Class II license, Internet sales or not. So I think that was – that was one issue, whether or not we were going to make an exception for Internet car sales. But if you're going to have vehicles on the lot they still would need a license; and if they were going to sell, they still would need a license. And the other thing is that we have, what, 21 licenses this year? About 21. In any event, we had many years ago come up with a policy of 20 Class II licenses because we felt that sufficiently met the needs to the town, and nobody has been yelling and screaming that they can't find enough used car lots. The only thing that I was thinking of is whether or not we really need to have a 12-month period in which a property owner basically would be grandfathered to come back with another license application. The reason we did this under No. 2 was so that no current license holders were hurt at the time we were over 20. But as this came up and I was thinking about it, I'd like to ask the Board to consider, you know, six months. I think we've seen that as soon as a site becomes available, there's somebody lined up right away to apply for the license.

> MR. CHAIRMAN: . . .So, you know, there are dealers now with Class II licenses who sell on the Internet right in town, and I don't think that they would suggest to you that they don't need a license because they still have a bricks and mortar location that they work from. So whether or not – I don't think this needs to be changed for Internet sales, but I think if they're going to maintain a place of business and they're going to have a facility for repair, they would have to have a license if they're going to do it in this town . . .

> MR. LEBEAUX: But I am – sorry. I am – as I initially said, I think there's no need to make some kind of special class or situation by which we go over 20 [Class II licenses] because of the means or the method that someone decides to try to market their vehicles.

> MR. CHAIRMAN: All right. We'll just hold this over and see if we want to do something on this six or the twelve months.

Grenier applied to the ZBA for a variance in order to sell motor vehicles at the Site since the use was not permitted within the LID. The ZBA granted the variance on December 18, 2007. Grenier was allowed to have five vehicles on site – three in storage and two on display. On January 28, 2008, the Board held a hearing on Grenier Construction d/b/a MAG Auto Sales' renewed application for a Class 2 license to sell used automobiles at the Site. At the hearing, Grenier stated, "I'm applying for a license so that I can then apply for dealer plates to move vehicles from auction to my location on 787 Hartford Turnpike." McCaffrey (who was chairing the meeting) stated that the Board's records reflected that there were already 20 Class 2 licenses in the Town. He went on to state in response to a question from Card:

> MR CHAIRMAN: I believe that you are correct, that the Board does have an internal maximum amount of 20 that has been set for some time, but I believe that that figure as being determined by the Board was based upon whether the public need has been met or not. And that's really the question that I think is before us this evening in trying to determine if we should exceed that figure and go to a 21st license. And that is really to the deliberation of this Board this evening.

Grenier responded that what was different about his planned used car business as compared to the traditional used auto business was that he was focusing on an Internet sales oriented business with respect to luxury and antique vehicles. He wanted to attract a larger audience of people interested in that type of vehicle. His attorney represented that his business was mostly going to be online so that there would not be rows of cars outside. Grenier explained that he would be purchasing vehicles at auction and then bring them to the Site with, "no more than two to five on the premises at any time." He went on to state, "99 percent of my business is going to be on line," but he expressed interest in being able to display select or unique vehicles outside that would attract a potential customer. Grenier stated that customers

could come to the Site to view and purchase vehicles, "[b]ut generally any sales on line dealing with people from different states, different areas of the country, and as it's – as the vehicle is described and then after an agreement is reached and the vehicle is sold, I'd then be transporting it to, you know, a shipper's location."   Grenier acknowledged that if a local individual saw one of his vehicles online, that individual could come to his premises. In other words, some of his sales might be conducted in the traditional fashion. His attorney acknowledged that it would not be correct to say that customers would not come to the premises to look at the vehicles. Grenier acknowledged that if he sold a vehicle to someone down the street or sold a vehicle to someone in California, the transaction would be the same. His attorney further explained that the main difference between his intended business and a traditional used car business was that Grenier was using Internet marketing as the main source of marketing.   Grenier stated that in addition to a local customer base, he hoped to have a regional or national customer base depending on who was looking for the type of vehicle he intended to list on eBay.

   After some discussion about the propriety of having Grenier's application under the name Grenier Construction Company, Chairman McCaffrey expressed his concerns to Grenier in relation to Policy 9:

> MR. CHAIRMAN: …you know, there is a real question in my mind as to whether the additional license is needed to meet the public need. And I have a concern about that and I think based on what I've heard tonight I'm not sure that this Internet business and the business that you're proposing Mr. Grenier, will meet the public need if one exists.
> I think it's going to – you know, it certainly will take some deliberation by this Board and an ultimate vote, but I have some concerns and I think I share them with Mr. Lebeaux as to whether that was, in fact, the case; and, you know, rather than having you step through this additional process, I think it's important that you're aware of that. I mean, certainly we haven't heard from the

public yet.   We're a little ways from probably closing this hearing, but
I thought it would be important to share that with you.

   The hearing was continued to February 11, 2008.   On February 11, 2008, the Board

reconvened the hearing of Grenier Construction Company d/b/a MAG Auto Sales. Grenier was

represented by an attorney at the hearing who represented that Grenier would be the business and

license holder.   Grenier was asked how his proposed business "would meet the public needs of

Shrewsbury" if the Board agreed to grant the Class 2 license in excess of the 20 license cap set

forth in Policy 9.   Grenier's attorney responded, "I think that it serves the public need inasmuch

as it probably in all likelihood will serve some local people that will see his ads on the Internet

and will probably do business with him."   Grenier informed the Board that all vehicles that he

planned to sell would be stored on Site.   He represented that all of his business would not be

conducted over the Internet so that he would have some personal contact.   Again, his attorney

represented that the only difference between Grenier's proposal and the traditional car sales was

the mode of advertising and the mode of communication with potential buyers. He would still be

subject to the same regulations as other used car dealers.   Grenier emphasized that his plan was

strictly to advertise on the Internet but he would be available for personal contact on an

appointment basis.

   The following comments were also made at the hearing by the Chairman who noted that

he had not heard from anyone saying that they did not have enough options for selling

or buying motor vehicles in town since Policy 9 was adopted:

> MR. CHAIRMAN: … there are dealers currently, bricks and
> mortar dealers, who exist who already sell on the Internet. So I
> need you to explain to me why we need, you know, nine years
> after we determined that this certain amount was necessary, why
> with no documentation that came to the Board or any place else

that I'm aware of that there's a gap in the public need that this business would serve.

ATTORNEY RICKER: I think that the best explanation I can give you is that the ability to serve people on a private basis or on an Internet basis such as what we are suggesting allows people hopefully to obtain a better product for better prices…. I think that competition such as this breeds better quality. And for lack of any other explanation, I think it's also just pure commerce and pure competition does good things all around.

The Board agreed to reflect on the issues and vote at the February 25, 2008 meeting.   On February 25, 2008, the Board voted to deny Grenier Construction Company d/b/a MAG Auto Sales' application for a Class 2 license on the grounds that, as a result of the hearing, it was determined that the public need was already being met by the 20 existing Class 2 licenses so that there was no reason to exceed the cap in Policy 9. Lebeaux commented that the only difference he saw between Grenier's application and traditional used car dealerships was the mode of advertising. He did not think that a different mode of advertising would impact whether or not there is a public need for an additional license.   While Miller initially considered voting in favor of granting Grenier a license, since she thought that Internet sales were a different animal, she ultimately concluded that Grenier's business would not serve the public need in a way that would be distinct enough to exempt it from Policy 9.   Chairman Depalo noted that he did not hear anybody saying it's about time we need more car dealers and that the public need was being met. He thought that the Internet business was already being served by traditional brick and mortar dealers.

On March 18, 2008, Grenier submitted a revised application under the name Matthew Grenier d/b/a MAG Auto Sales.   On April 14, 2008, the Board held another hearing for Matthew Grenier, d/b/a MAG Auto Sales's application for a Class 2 license. At the hearing,

Grenier stated that the revised application was essentially identical to the application submitted by Grenier Construction Company d/b/a MAG Auto Sales and that nothing had changed since the last hearing.   Grenier represented that he would advertise a vehicle on the Internet and, as a result, he could receive interest from someone in town or a surrounding town that would come to the Site and view a vehicle.

One of the Board Members asked Grenier how it would "benefit Shrewsbury to extend the 20 figure that exists currently." Grenier responded, "I don't necessarily know how it would benefit Shrewsbury, but I don't see any downside to it."   The Board voted to deny Grenier's application for a Class 2 license on the grounds that the public need was already being met with regard to the 20 Class 2 licenses already serving the public in the Town and there was no reason to exceed the cap contained in Policy 9.   Chairman Depalo noted that other used car dealers were already using the Internet for sales so he did not believe adding another dealer added to satisfying the public's need.

### State Court Review Of the Board's Denial

On April 22, 2008, Grenier filed a complaint in Worcester Superior Court seeking a declaratory judgment that Policy 9 was invalid and in violation of Mass.Gen.L. ch. 140, § 59.   In addition, Grenier sought a declaration that the Board's denial of his Class 2 license application was unlawful, not based on substantial evidence, and was arbitrary and capricious, and that, accordingly, an order should issue granting Grenier a Class 2 license.

Following is a summary of the relevant testimony given by Board Members and Grenier at the bench trial in the Worcester Superior Court:

*Depalo Testimony*

Depalo testified that in 1999, the subject of used car licenses came before the Board. He noted that there were complaints from citizens that there were too many car lots in town. Consequently, the Board decided to look into the issue and investigate how other towns regulated the number of lots. The Board voted in favor of granting Enterprise a Class 2 License because it was an ancillary use to, and necessary for, the rental business. Also, it was seen as a business that would operate once or twice a year. As it turned out, Enterprise never obtained the license. Depalo testified that there were various reasons that the Board denied Grenier's application: the public need was already being served by the existing car dealers including, internet sales; there was no evidence at the hearing that the public was looking for more options; and there was concern about monitoring the sales and service after the sales. In the end, the decision was based upon what the Board defined as the needs of the Town.

*Lebeaux Testimony*

Lebeaux was also involved in the creation of Policy No. 9. From his perspective, there had been a rapid growth of car dealerships in town. Lebeaux considered Enterprise's application different from other used car businesses because it was principally a car rental business and the town did not have any car rental businesses. He considered the used car sale portion of the business to be ancillary to the rental business. It was necessary for Enterprise's business model to sell off the older vehicles that had been rented.

*Card Testimony*

Card was on the Board when Policy No. 9 was enacted. He testified that the Board had conducted a survey of the towns of Holden, Northborough, Westborough and others because there was a surge of used car dealerships in town. He had also heard from local citizens that thought there were enough licenses in town. Card considered Enterprise's application different than the other existing licenses because it was primarily focused on car rentals. The only difference he was aware of regarding Grenier's application compared to the other 20 in existence was that he would be marketing his cars on the Internet. However, Mr. Card knew that others existing used car dealers in Town also marketed cars on the Internet. He voted against Grenier's application because he thought that the needs of the town were already being met. It was his presumption that no more than 20 licenses would be granted.

*Miller Testimony*

Miller was relatively new on the Board and was not on the Board at the time of Enterprise's application. She voted against Grenier's application because she did not think that his business model justified exceeding the limit of 20 set in Policy 9. In addition, she did not think it served the need of the local Town community because Grenier said that over 90 percent of the business would come from outside the Town. Furthermore, she had not heard from the public that there was a need for more licenses beyond the policy.

*Grenier Testimony*

Grenier testified that he knew that some of the other 20 dealerships in town also operated on the Internet. He viewed his model as different because he was primarily selling over the Internet, whereas, the other dealerships were selling primarily off their lots. Grenier also testified that the Board had raised questions about servicing the vehicles. Consequently, he had to provide a service garage. He recalled the Board having a big issue with the warranty work on a vehicle.

After the bench trial, the court issued a decision affirming the Board's decision. The court concluded that the Board was well within both its executive and its legislative authority to enact Policy 9. One impetus for Policy 9 was complaints from Town residents about the number of used car establishments in town. The court found that Policy 9 was enacted in good faith following research, investigation, deliberation and public hearing, all in keeping with the Board's role as policy maker for the Town. The court concluded that there was no evidence in the record that the Board applied Policy 9 in an arbitrary or capricious fashion. Finally, the court found that "the Board's determination that Grenier's business plan did not sufficiently meet the needs of the Shrewsbury public was reasonable, and was arrived at following appropriate notice to Grenier, public airing of issues and full deliberation…. Accordingly, there was substantial evidence for the decision, and no error of law or abuse of the Board's discretion." *Grenier v. Town of Shrewsbury*, No. 200800913C, 2009 WL 5698110, *4 (Mass.Sup. Dec. 3, 2009). The court further found that

Enterprise's application was readily distinguishable from Grenier's application in numerous respects. Specifically, Enterprise's proposed use could provide needed services, namely automobile rentals, jobs and tax revenues for the Town. *Id.*

On December 21, 2009, Grenier appealed the Superior Court's decision to the MAC. On September 26, 2011, the MAC reversed the Superior Court's decision. *See Grenier v. Board of Selectmen of Shrewsbury,* 80 Mass. App. Ct. 460, 464 (2011). The MAC found that Policy 9 did not contain "neutral and defined standards" to ensure "fair and even-handed review of applications by the board…." For the reasons, the MAC found that Policy 9 was invalid. *Id. at 464-65.* The MAC went on to note that even if Policy 9 were valid, its "lack of standards" allowed for an "arbitrary and capricious application" with respect to Grenier. *Id. at 465.* The MAC stated:

> In light of our disposition and the determination that Policy 9, by its terms, is in conflict with the licensing statute [Mass.Gen.L. ch. 140, § 59], and that Policy 9, as applied in this case, was not supported by substantial evidence and was arbitrary and capricious, we need not address the plaintiff's arguments that Policy 9 imposes an improper restraint on interstate commerce by what amounts to a "blackout" on Internet sales, which impermissibly reduces competition within the town, as well as the national used car market.

*Id.* at 462, n. 6 (dicta).

On September 27, 2011, immediately after the MAC decision, Grenier was issued a Class 2 license to sell used cars at the Site. Despite the fact that Grenier has not operated a used car dealership at the Site since he was issued a Class 2 license, the Board has renewed Grenier's Class 2 license each year.

## Discussion

In order to establish a claim under Section 1983, Grenier must establish that a person acting under the color of law denied him a right secured by the constitution or by federal law. The only question in this case is whether Grenier's constitutional rights were violated, that is whether the Board's denial of his application for a Class 2 license violated his due process rights, or placed an undue burden on interstate commerce.

### *Grenier's Due Process Claims*

> The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving any person of 'life, liberty, or property, without due process of law.' This prohibition guards against 'the arbitrary exercise of the powers of government.' …

> The Due Process Clause has both procedural and substantive components. The former 'ensures that government, when dealing with private persons, will use fair procedures.' The latter 'safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them.'

*Harron v. Town of Franklin*, 660 F.3d 531, 535-36 (1st Cir. 2011)(internal citations and citations to quoted authorities omitted).   Grenier has asserted a violation of his substantive and procedural due process rights-- his claims are based on an alleged deprivation of a property right. "Property interests are created and defined by 'existing rules or understandings that stem from an independent source such as state law.' In order to qualify as a property interest, state law must give an 'individual a legitimate claim of entitlement to some sort of benefit.' "   *Alvarado Aguilera v. Negron*, 509 F.3d 50, 53 (1st Cir. 2007).   The Massachusetts Supreme Judicial Court ("SJC") has expressly held that an applicant for a license to deal in used motor vehicles under Mass.Gen.L. ch. 140, § 59 "do[es] not have a claim of entitlement to such a license." *Roslindale Motor Sales, Inc. v. Police Com'r of Boston*, 405 Mass. 79, 82, 538 N.E.2d 312 (1989); *see also Kennie v. Natural*

*Resources Dept.,* 451 Mass. 754, 2008, 889 N.E.2d 936 (2008)(plaintiff cannot bring due process claim where only property interest asserted is in interest in license itself).

Grenier acknowledges the SJC's holding, but then argues that he "absolutely and unequivocally has a secured right to 'fair treatment'". *Pl's Mem. In Sup. Of His Opp. To Def's Mot. For Sum J.* (Docket No. 50), at p. 3. It is true that the SJC stated that while an applicant for such a license is not entitled to an evidentiary hearing, "as a matter of fundamental fairness, an applicant … is entitled to a specific statement … setting forth the reason or reasons for [the denial]". *Id.*, at 83, 538 N.E.2d 312. However, Grenier's suggestion that by this language the SJC was acknowledging that an applicant for a Class 2 license has a right secured by the constitution is a non-sequitur. Instead, the SJC created an entitlement which is grounded in common law and/or the relevant licensing statute. By imposing a requirement that the licensing authority provide a specific statement of reasons for denying an application, the SJC has assured that the applicant can obtain meaningful judicial review—as required by the statutory scheme. *See* Mass.Gen.L. ch. 140, §59. Simply put, under Massachusetts law, Grenier does not have a property interest in a Class 2 license to deal used cars.

Since Grenier has no property interest in a Class 2 license, he cannot assert claims under Section 1983 for violation of his rights to substantive and procedural due process. This requires that summary judgment enter for the Defendants on Grenier's due process claims. Nonetheless, for the sake of completeness, I will assume that Grenier has asserted the requisite property interest and will analyze whether he has otherwise established a claim for violation of his substantive and/or procedural due process rights.

<u>*Whether Plaintiff's Substantive Due Process Rights Were Violated*</u>

*Plaintiff's Motion For Partial Summary Judgment On His Substantive Due Process Claim:
Whether Relitigation Of this Claim is Barred By Principles of Res Judicata, Collateral Estoppel
And/Or Issue Preclusion*

The MAC found that the Board's denial of Grenier's application under Policy 9 "was not based on substantial evidence, and was arbitrary and capricious," *see Grenier v. Board of Selectmen,* 80 Mass.App.Ct. 460, 462 (2011)(*dicta*).   Grenier asserts that this finding constitutes res judicata, issue preclusion and/or collateral estoppels for purposes of his substantive due process claim and therefore, he is entitled to summary judgment on that clam, as a matter of law.

"*Res judicata,* in its claim preclusion aspect, is intended to prevent the re-litigation of claims already litigated or that should have been litigated in an earlier action; in its issue preclusion aspect, it prevents (with qualifications) re-litigation of issues earlier decided even if the subsequent case involves a different claim. In considering the preclusive effect of a Massachusetts judgment, we look to Massachusetts law." *Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 30 (1st Cir. 2010)(internal citation omitted).   Grenier asserts that issue preclusion applies in this case as to the issue of whether his due process rights were actually violated. "[I]ssue preclusion 'prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies.' " *Kobrin v. Bd. of Registration in Med.,* 444 Mass. 837, 843, 832 N.E.2d 628, 634 (2005)(citation to quoted case omitted).   "In order for issue preclusion to apply, 'a court must determine that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication.' 'Additionally, the issue decided in the prior adjudication must have been essential to the earlier judgment.'   The party asserting

claim or issue preclusion 'bear[s] the burden of proof on the elements.'" *Spark Energy Gas, LP v. Toxikon Corp.*, 908 F. Supp. 2d 267, 273 (D. Mass. 2012)(internal citations and citations to quoted cases omitted).

A protracted discussion of Grenier's argument is not warranted. The case before the MAC addressed Grenier's action for declaratory relief against the Board and the Town seeking review of the Board's denial of his application for a Class 2 license to sell used cars. In this action, he is suing the Town, the Board and the Board Members, in their individual capacities, for damages under Section 1983 for violation of his substantive due process rights.[4] I will assume for purposes of this discussion that the first and second elements have been satisfied and focus on the third element, *i.e.*, identity of the issues.

"To establish a substantive due process claim, a plaintiff must demonstrate an 'abuse of government power that shocks the conscience' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.' *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001). I find that Grenier cannot satisfy the third element for the obvious reason that the standard applied by the MAC when, *in dicta*, it found that the Board had wrongfully denied him a Class 2 license, *i.e.*, arbitrary and capricious, simply does not equate to the standard applicable to a substantive due process violation, *i.e.*, "shocks the conscience," or "legally irrational in that it is

---

[4] Grenier also seeks summary judgment on his procedural due process claim. With respect to this claim, he does not appear to be asserting that the Defendants are barred from relitigating the issue of whether his procedural due process rights were violated. Instead, he asserts that, as a matter of law, the Defendants denied him his due process right to adequate notice, a fair hearing and fair application of the law. Defendants seek summary judgment as to this claim on the grounds that Grenier received all the process he was due. Because the material facts in this case are undisputed, I will address the parties' cross-motions for summary judgment on Grenier's procedural due process claim simultaneously. To the extent that the Court has misread Grenier's submission and he is seeking summary judgment on this claim on grounds of issue preclusion, his motion is denied. Simply put, Grenier has failed to establish an identity of issues between the state court action and the Section 1983 procedural due process claim he asserts in this case. More specifically, the issue of whether Grenier's procedural due process rights were violated, that is, whether he (1) had a property interest in a Class 2 license, and (2) was provided a full and fair hearing on his application for a Class 2 license, was not adjudicated in the state court proceedings.

not keyed to *any* legitimate [government] interest." *See Amsden v. Moran*, 904 F.2d 748, 754 n.5 (1st Cir. 1990)("though in common parlance the phrase 'arbitrary and capricious' may indicate an absolute lack of rationality not susceptible to adjectives of degree, its legal usages are decidedly otherwise. In the substantive due process context, the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error."). Moreover, the MAC did not decide the issue of whether Grenier has a property interest in a Class 2 license, which, as discussed above, is a pre-requisite to a substantive due process claim. Simply put, the MAC's finding that the Board's acted in an arbitrary and capricious manner in denying Grenier a license *simply cannot* serve to preclude the Defendants in this case from litigating the clearly non-identical issue of whether his substantive due process rights were violated. Therefore, Grenier's motion for partial summary judgment on his substantive due process claim is denied.

*Defendants' Motion For Summary Judgment on Grenier's Substantive Due Process Claim*

"Where, as here, a plaintiff's substantive due process claims challenge the constitutionality of certain executive acts, 'the plaintiff must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property.'" *Harron*, 660 F.3d at 536. For purposes of this opinion, I have assumed that Grenier has established that he has a protected property interest in the Class 2 license. In any event, courts will generally begin the substantive due process analysis by determining whether the alleged acts "were conscience-shocking." *Id.*

> 'There is no scientifically precise formula for determining whether executive action is—or is not—sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment.' However, certain principles have emerged from the case law. Executive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable,' and 'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error,' Indeed, '[a] hallmark of successful challenges is an extreme

lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' With particular relevance to this case, we have said that 'any permit or license denial, no matter how unattractive, that falls short of being "truly horrendous" is unlikely to qualify as conscience-shocking.'

*Harron*, 660 F.3d at 536.

Grenier's allegations fall far short of establishing that Defendants' actions were "truly outrageous, uncivilized, and intolerable." On the contrary, the Board Members voted to deny Grenier a Class 2 license based on a written Town policy, Policy 9, that had been in place for over a decade. While they had previously approved a license (to Enterprise) which appeared to conflict with Policy 9, Board Members explained on the record why they had approved Enterprise's application while denying Grenier's—they felt that Enterprise was primarily in the rent-a-car business and the sale of used vehicles would be collateral to that business. Since the Town did not have a rent-a-car business, issuance of a Class 2 license to Enterprise met a public need. As to Grenier, the Board ultimately concluded that his proposed used car business, which would primarily involve Internet sales, did not serve a public need because there were already 20 licensed used car dealers in the Town, including some used car dealers who sold vehicles on the Internet. Ultimately, the Board concluded that the fact that Grenier would *primarily* sell his cars on the Internet was not enough to differentiate him from other used car dealers because: (1) he would still maintain cars on his lot which he would attempt to sell through traditional channels, and (2) people might still come to the business to look at the cars. Grenier's application was denied on the grounds it did not serve a public need which warranted exceeding Policy 9's cap on the issuance of Class 2 licenses. As explained more fully below, there is nothing "truly horrendous" about this decision.

The MAC struck Policy 9 after finding it conflicted with the licensing scheme set forth in Mass.Gen.L., ch. 140, §59 (licensing statute) because it was not based on neutral and defined standards.   The MAC stated that even if it were to have found Policy 9 valid, the Board's application of the policy was arbitrary and capricious, essentially based on undefined standards and unsupported by substantial evidence in the record.   However, missing from the MAC's opinion is any suggestion that the Board, or any Board Member, acted with malice or intent to injure, "rather than a merely careless or unwise excess of zeal." *See Harron*, 660 F.3d at 536; *Collins*, 244 F.3d at 251.   Moreover, I find that the Board's discussions were measured and confined to determining whether Grenier's proposal would serve the public need.

On the record before me, I find that Grenier has failed to allege facts which establish that Defendants' actions in denying his license application were anything other than "run of the mill" error.   I further find that there is no genuine issue of material fact that Defendants' conduct in denying Grenier a Class 2 license, albeit wrong, was not conscience-shocking. Therefore, Defendants are entitled to summary judgment on Grenier's substantive due process claim. *See also Collins*, 244 F.3d at 250 ("unforgiving" standard applied to substantive due process claims guards against insinuating oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals).

*The Parties' Cross-Motions For Summary Judgment On Grenier's Procedural Due Process Claim*

" 'We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"   *Harron*, 660 F.3d at 537.   The gravamen of Grenier's claim is somewhat unclear to the Court.   Grenier does not contend that he was not given notice and a hearing before the Board,

or an opportunity for meaningful judicial review.   Indeed, he acknowledges remedies were

available to him and he fully exhausted those remedies.   Rather, he argues that the hearing he was

given was unfair because the Board did not apply any discernible standards— its decision was

arbitrary and capricious.   Essentially, Grenier is asserting that because the Board wrongly denied

his application, the procedures made available to him were inadequate, as a matter of law, and he is

entitled to be recompensed in the amount it cost him to pursue all available remedies and,

ultimately, prevail.   However, this is simply not the standard for recovering on a procedural due

process claim.   It appears that plaintiff was provided notice and an opportunity to be heard before

the licensing authority.   However, even if I assume he was not, it is clear that he had an adequate

post-deprivation remedy in the form of judicial review of the licensing authorities' decision.

Therefore, he was provided sufficient process.[5]   *See Bolduc v. Town of Webster,* 629 F. Supp. 2d

132, 148 (D.Mass. 2009)*(* if state provides adequate post-deprivation remedies—either by statute

or through the common-law tort remedies available in its courts—no claim of violation of

procedural due process can be brought under Section 1983 against the officials whose random and

unauthorized conduct caused the deprivation); *Mongeau v. City of Marlborough,* 462 F. Supp. 2d

144, 150 (D.Mass. 2006) *aff'd,* 492 F.3d 14 (1st Cir. 2007)(First Circuit has declared that "where ...

the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily

---

[5] In his opposition, Grenier suggest that to the extent he did not properly plead his procedural due process claim, he be permitted to amend his complaint. The time for seeking to amend pleadings has long since passed. *See Scheduling Order* (Docket No. 17)(deadline for amending pleadings set for 4/9/2013).   Therefore, Grenier must establish "good cause" for the amendment. *Cruz v. Bristol-Myers Squibb Co., PR,* 699 F.3d 563, 569 (1st Cir. 2012)(because motions to amend came after deadline established by district court's scheduling order, they could be granted only upon showing of good cause).   Furthermore, the request comes after the Defendants have filed their motion for summary judgment and therefore, he must also establish that "any proposed amendment [is] theoretically viable and supported by substantial evidence." *Somascan, Inc. v. Philips Med. Sys. Nederland, B.V.,* 714 F.3d 62, 65 (1st Cir. 2013).   Grenier has not established "good cause" for permitting him to further amend his complaint, nor has he established that any proposed amendment would be viable and supported by substantial evidence. Therefore, to the extent he request permission to amend his complaint, the request is denied.

obtain federal court review of local zoning and planning disputes by means of 42 U.S.C. § 1983";
even bad faith refusal to follow state law in local administrative matters does not amount to
deprivation of due process where state courts are available to correct error). Defendants' motion
for summary judgment with respect to this claim is granted and Grenier's motion for summary
judgment on this claim is denied.

### *Defendants' Motion For Summary Judgment On Grenier's Interstate Commerce Claim*

Grenier alleges that the Defendants' denial of his application for a Class 2 used car dealer
license was an improper restraint on interstate commerce because the Board denied him a license
on the grounds that his proposed business would be engaged in Internet sales. More specifically,
he alleges that "States, cities and municipalities have no authority to regulate interstate commerce
where the federal government has the power to regulate …. Defendants' actions, denying
permitting because the business engages in Internet sales, discriminates against interstate
commerce.". *Complaint*, at ¶¶ 65-66. Grenier asserts that he is not alleging that Policy 9 violated
the Commerce Clause. Instead, he is alleging that the Board's denial of his application for a class 2
license violated the Commerce Clause because the evidence establishes that Board Members were
uncomfortable with the Internet sales aspect of his business.[6] He argues that the Board's act
"facially discriminates" against interstate commerce.

> The Commerce Clause grants Congress the power to regulate commerce
> among the states. 'This power 'presumes a national market free from local
> legislation that discriminates in favor of local interests.' The Commerce Clause is,
> therefore, not only an authorization for congressional action, but also a restriction
> on local regulation of interstate commerce. To that effect, the Commerce Clause

---

[6] Grenier did not submit a concise statement of material facts as to which he contends there is a dispute, nor
did he file a separate supplemental statement of material facts. *See* LR,D.Mass. 56.1 Facts asserted in a memorandum
will not generally be considered by the Court in deciding a motion for summary judgment. Nonetheless, I will
consider those facts which Grenier has cited in the context of his Commerce Clause argument. However, I will note
that I am skeptical that the evidence cited to by Grenier supports his contention that the Board Members did not
understand how Internet sales would work or that they were uncomfortable.

has been deemed to include an implied 'negative command' that prevents a state or municipality from 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.' 'This restrictive aspect of the Commerce Clause is known as the dormant Commerce Clause.'

*Florida Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F. Supp.2d 1260, 1273 (S.D. Fla. 2010) *aff'd*

*sub nom. Florida Transp. Servs., Inc. v. Miami-Dade Cnty.,* 703 F.3d 1230 (11th Cir.

2012)(internal citations and citations to quoted authorities omitted).

The Supreme Court has explained that '[t]he central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is *local economic protectionism,* laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent.' Accordingly, a state regulation 'discriminates' against interstate commerce only if it 'impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of State.' … in order to state a claim for discrimination in violation of the Commerce Clause, a plaintiff must 'identify an[ ] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors.

*Selevan v. New York Thruway Auth.*, 584 F.3d 82, 94-95 (2[d] Cir. 2009)(internals citations and

quoted cases omitted).

I find that Grenier's claim fails because he has "failed to 'identify an[ ] in-state

commercial interest that is favored,' and … do[es] not point to a particular 'out-of-state

competitor' that was harmed" by the Board's denial of his license. *Id.*, at 95. Both an in-state

interest and an out-of-state competitor are necessary because "laws that draw distinctions between

entities that are not competitors do not 'discriminate' for purposes of the dormant Commerce

Clause." Thus, Grenier has failed to properly allege that the Board's action discriminated against

interstate commerce.

This does not end the inquiry, "under the so-called *Pike* test, a nondiscriminatory

regulation that 'regulates even-handedly to effectuate a legitimate local public interest,' *Pike v.*

*Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844 (1970), is nevertheless unconstitutional if ' " 'the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.' " '   In this case, the Board voted to deny Grenier a Class 2 license used car dealer license because they determined that the fact that he would *primarily* sell cars over the Internet would not benefit the town given that there were already 20 used car dealers in town, some of whom *already* sold cars over the Internet.   Grenier has focused only on the impact the Board's decision had on him.   However, "whether a state [or in this case, municipal] policy violates the dormant Commerce Clause does not depend on the extent of its impact on *an individual plaintiff*. Rather, a state [or municipal] policy that is challenged under the dormant Commerce Clause must be judged by its overall economic impact on *interstate commerce* in relation to the putative local benefits conferred." *Selevan*, 584 F.3d at 96 (second alteration in original).   Under the circumstances, I find that Grenier has failed to allege a claim for violation of the dormant Commerce Clause.   Therefore, Defendants' motion for summary judgment is granted with respect to this claim.[7]

### Conclusion

It is hereby Ordered that:

(1) Plaintiff's Motion for Partial Summary Judgment For Count 1: Violations Of Due Process Rights Under 42 U.S.C. §1983 Pursuant to Fed.R.Civ.P. 56 (Docket No. 41) is ***denied***;

(2) Defendants' Motion For Summary Judgment (Docket No. 43) is ***granted***; and

---

[7]   Since I have found that Grenier's constitutional rights were not violated, it is not necessary for me to address the Defendants' assertion that he has failed to state a claim against the Town under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018 (1978)(in order to establish Section 1983 claim against municipality, plaintiff must identify municipal policy or custom that caused injury).   *See Evans v. Avery*, 100F.3d 1033 (1st Cir.1996)(municipality cannot be found liable were there has been no constitutional violation committed by individual employee).   Additionally, it is not necessary for me to address Defendants' assertion that the individual Defendants, *i.e.,* the Board Members, are entitled to qualified immunity.

(3) Plaintiff's Motion To Strike (Docket No. 51) is ***denied***.

Judgment shall enter for the Defendants.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**